David M. BERTONCINI, David N. Bock, Jr., Timothy A. Bock, Robert M. Butler, Jr., Timothy J. Day, John Fallon, Philip F. Fiore, Christopher Jannitto, Michael Johnson, Edward L. MacDonald, III, Thomas Miller, James J. Nunes, Robert Pridemore, Rocco T. Sauro, Michael T. Sullivan, Kenneth J. Turchetti, James L. Varin, Douglas L. Deegan, Russell G. Gross and Ronald M. Lefaivre, Plaintiffs,

v.

The CITY OF PROVIDENCE, Vincent A. Cianci, Jr., Individually and in his Capacity as Mayor of Providence, Gilbert McLaughlin, Individually and in his Capacity as Chief of the Providence Fire Department, and John Partington, Sr., Individually and in his Capacity as Commissioner of Public Safety of the City of Providence, Defendants.

Civ. A. No. 91–0303–T.

United States District Court, D. Rhode Island.

July 22, 1991.

Joseph J. Rodio, Rodio & Ursillo, Michael K. Marran, Providence, R.I., for plaintiffs.

Catherine Elizabeth Graziano, Hawkins & Hoopis, Kevin F. McHugh, City Solici-

tor's Office, Providence, R.I., for defendants.

## MEMORANDUM AND ORDER

TORRES, District Judge.

This is an action to enjoin the City of Providence (the "City") and its Fire Department from commencing a training school for prospective fire fighters and to declare void what the plaintiffs describe as the Fire Departments's efforts "to establish or maintain a quota system for women, blacks or other minority recruits" in its hiring practices. Amended Verified Complaint ¶ 3 at 15. The plaintiffs are applicants who were not selected to attend the school and contend that the selection process discriminates against them on the basis of race and sex in violation of the Equal Protection Clause of the Fourteenth Amendment, U.S. Const. amend. XIV, § 1, and Title VII, 42 U.S.C. §§ 2000e et seq., and that it gives rise to a cause of action on various theories arising under state law. The case is presently before the Court for decision on the plaintiffs' motion for a preliminary injunction.

## FACTS

The facts currently before the Court were presented in the form of a stipulation filed by the parties and during evidentiary hearings conducted over a period of four days. Sometime before September 15, 1990, the City of Providence perceived a need to hire additional fire fighters to fill vacancies created by anticipated retirements and minimum staffing requirements provided in a new collective bargaining agreement. The number of new fire fighters needed was originally thought to be 80, but that figure was later revised to 140.

In order to be hired as a Providence fire fighter, an applicant must be at least 18 years of age, have the equivalent of a twelfth grade education and successfully complete a 26 week training course which is referred to as a "school" for fire fight-

ers. Schools are conducted on an ad hoc basis whenever the need for hiring additional fire fighters arises.

In order to gain admittance into the school, an applicant must first pass a written examination and then a physical agility test. Applicants who pass both tests are ranked on the basis of a composite score that attaches equal weight to the grades received on each test. The number of applicants necessary to produce the desired enrollment in the school is tentatively selected from that list. However, before they can attend the school, they must satisfactorily complete a medical examination, a psychological evaluation and a police background check. Applicants who do not clear those hurdles are replaced by others selected from the list.

On September 15, 1990, the City began advertising for candidates. Its solicitations included what were described as aggressive efforts to recruit minority candidates by, among other things, contacting minority organizations. The City's plan was to conduct an initial school for 60 candidates during July of 1991 (the "July 24 school") and two additional schools for 40 candidates each sometime during 1992.

Applications were submitted by 1,754 individuals. 1,173 of them took the written examination, and 727 passed. Only 607 of that number elected to take the physical agility test, and 536 of them passed it, too. Of the applicants successfully completing both tests, 23 were males belonging to minority groups [1] and 7 were women. It is not clear whether any of the women were also members of minority groups.

Fifty-eight of the 60 highest ranked applicants were white males and 2 were males belonging to minority groups. The first 48, all of whom were white males, were selected to attend the school subject to successful completion of the medical examination, psychological examination and police background check. The remaining

---

1. The Providence Fire Department's 1989–1992 Affirmative Action Program defines "minority groups" to include "Blacks, Hispanics, American Indians or Alaskan Natives, Asian and Pacific Islanders." This same definition is used in the City of Providence's 1989–1992 Affirmative Action Plan.

12 selections were made in order of rank from among the minority and female applicants based on a decision that, pursuant to the City's affirmative action plan, 20% of those selected should be members of those groups. Their rankings range from 50 to 373.

The plaintiffs are twenty white males who successfully completed both the mental examination and the physical agility test but were not selected for the July 24 school. One of them, Russell G. Gross, is 57th on the ranking list. The rankings of the others range from 81 to 467. The plaintiffs contend that the preference given to minority and women applicants violates their Fourteenth Amendment Equal Protection rights and the provisions of Title VII.

## PRELIMINARY INJUNCTION STANDARD

■ One of the principal purposes of a preliminary injunction is to preserve the status quo pending ultimate resolution of the case. *Tri–State Generation and Transmission Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986). However, a preliminary injunction is a drastic form of relief because it affects the rights of a party before that party has had an adequate opportunity to develop and present the merits of its case. Consequently, courts have devised a rather rigorous standard that must be satisfied before such relief is granted.

That standard is well established. It requires the party seeking the injunction to demonstrate:

(1) That it does not have an adequate remedy at law and will suffer irreparable harm before the case can be litigated on the merits if the injunction is *not* granted;

(2) That such harm outweighs any harm that the adverse party will suffer if the injunction *is* granted;

(3) That it is likely to ultimately succeed on the merits of its claim; and

(4) That the requested injunction will not adversely affect the public interest.

*Collazo Rivera v. Torres Gaztambide*, 812 F.2d 258, 259 (1st Cir.1987); *Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981).

## DISCUSSION

### I. *Irreparable Harm To Plaintiffs*

One form of irreparable harm claimed by the plaintiffs is the lost opportunity to become fire fighters. The City contends that failure to be selected for the July 24 school does not constitute irreparable harm because candidates for the two schools scheduled to be conducted during 1992 will be drawn from the same list. However, there is no guarantee either that additional schools will be conducted or that the same applicant list will be used. In addition, graduates of subsequent schools will have less seniority than graduates of the July 24 school. That will permanently and adversely affect their rights with respect to matters such as compensation, preferences in selecting vacations and eligibility for promotion. Due to the spacing of promotional examinations, a loss of as little as six months seniority may result in a delay of as much as two years before a fire fighter becomes eligible to take a promotional examination.

Furthermore, it appears that the Court will be unable to completely restore any seniority that the plaintiffs might lose if they are wrongfully excluded from the July 24 school. Graduates of each school are ranked based on their performance at the school and are hired in order of their ranking. Consequently, even if one who does not attend the July 24 school graduates from a later school, it would be impossible to fairly establish that person's seniority vis-à-vis the individual graduates of the earlier school.

■ Nevertheless, in determining whether the plaintiffs will suffer that kind of harm if a preliminary injunction does not issue, a distinction must be drawn between Gross and the remaining plaintiffs. As previously noted, Gross is the only one whose composite test score ranks him among the top 60 applicants. The rankings of the other plaintiffs range from 81 to 467. Therefore, Gross is the only plaintiff

who would be chosen for the July 24 school if the 20% setaside is declared invalid and the City is required to select solely on the basis of test scores. To put it another way, none of the plaintiffs, except Gross, would be admitted to the July 24 school even if a preliminary injunction is granted. Therefore, none of them can claim to be irreparably harmed by the failure to issue an injunction. The possibility that they might be selected for some future school and, if so, that their seniority might be lessened is too remote and speculative to warrant injunctive relief. *Cf. Tangren v. Wackenhut Serv., Inc.,* 658 F.2d 705, 707 (9th Cir.1981). That is especially true inasmuch as 15 of the plaintiffs rank below 140.

## II. *Irreparable Harm To Defendants*

■ The level of harm that the City will suffer if an injunction is granted depends upon the scope of the injunction. At the present time, the City makes up for existing manpower shortages by utilizing off duty fire fighters who work overtime and are compensated at time and one-half. If the City is enjoined from proceeding with the July 24 school, the period during which this practice must be continued will be lengthened. The precise differential between overtime rates and the cost of paying new recruits is difficult to calculate but appears to be approximately $12,000 per week.

In addition, enjoining the July 24 school would harm the 48 white males and two minorities whose scores placed them among the top 60 candidates and whose selection has not been challenged by anyone as well as the remaining 10 minority and female applicants who tentatively have been selected.

On the other hand, the City will suffer no harm if it is required to include Gross in the school. The Fire Chief testified that schools have been conducted successfully with as many as 71 attendees although the optimum number is somewhat less than that. Moreover, it was stated that the enrollment has been increased from 60 to 61 in order to accommodate an applicant who is the child of a fire fighter killed in the line of duty pursuant to longstanding departmental policy and that, in fact, there are 62 available slots at the school. Finally, the City's need for additional fire fighters far exceeds the number slated to attend the July 24 school. As previously noted, the City plans to hire 140 new fire fighters during the next year. Therefore the addition of one person to the July 24 school will not have any adverse effect upon the City.

In short, the Court finds that none of the plaintiffs besides Gross will be irreparably deprived of anything to which they would otherwise be entitled if a preliminary injunction does not issue. On the other hand, the City will not suffer any harm if it is required to include Gross in the July 24 school. Consequently, the balancing of the harms component of the preliminary injunction test weighs very heavily against enjoining the July 24 school and in favor of requiring that Gross be permitted to attend subject to satisfactorily completing a medical examination, a psychological evaluation and a police background check.

## III. *Public Interest*

Analysis of the public interest that might be served by granting or denying an injunction provides little guidance in this case. The prospect of enjoining the July 24 school implicates two conflicting and equally compelling public interests. One is the public's strong interest in ensuring that the City does not discriminate against individuals based on their race and/or gender even if they happen to be white males. The other is the public's equally compelling interest in rectifying any past discrimination that may have resulted in the exclusion of minorities and/or women from public employment by ensuring that reasonable steps are taken so that the composition of the Providence Fire Department more accurately reflects the composition of the pool of qualified individuals from which it is drawn.

The plaintiffs assert that failure to enjoin the July 24 school would also run counter to the public's interest in ensuring that only qualified individuals become fire fighters. They properly point out that citizens'

lives and property are in many ways dependent upon the fire fighters' ability to competently discharge their duties. However, the uncontradicted evidence is that all 536 applicants who passed the written examination and physical agility test are *qualified* to be trained as fire fighters. Consequently, at most, the plaintiffs are referring to the *relative* qualifications of those selected rather than whether they are qualified or unqualified.

When the prospect of merely requiring that Gross be included in the July 24 school is considered, any conflict among the various public interests disappears. There is no question about Gross's qualifications. Furthermore, if he ultimately prevails in this case, his exclusion would constitute the kind of discrimination that the public has an interest in preventing.

## IV. *Likelihood of Success*

It is always difficult to assess a plaintiff's likelihood of ultimate success at such a preliminary stage when the facts have not yet been fully developed. In this case it is especially difficult because counsel have not yet had an opportunity to fully address all of the complex legal issues presented. The difficulty is compounded by the fact that the Supreme Court itself appears to be of several minds on the subject as evidenced by the profusion of concurring and dissenting opinions contained in its decisions.

The perils of navigating these incompletely charted waters are somewhat reduced by the fact that, in this case, the balancing of the harms component of the preliminary injunction test is so heavily weighted in favor of Gross and against the remaining plaintiffs that the significance of the likelihood of success component is correspondingly diminished. Nevertheless, some analysis is required particularly since future schools are also contemplated.

As previously indicated, the plaintiffs challenge the selection process as a violation of both the Equal Protection Clause and Title VII. Since the principles applicable to the two claims appear to be somewhat different, the Court will address them separately.

### A. *Equal Protection*

The Supreme Court has consistently repudiated distinctions between citizens that are based solely on their race or ancestry as " 'odious to a free people whose institutions are founded upon the doctrine of equality.' " *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 273, 106 S.Ct. 1842, 1846, 90 L.Ed.2d 260 (1986) (quoting *Loving v. Virginia*, 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967)). More specifically, it has held that public employers "must act in accordance with a 'core purpose of the Fourteenth Amendment' which is to 'do away with all governmentally imposed discriminations based on race.' " *Id.* at 277, 106 S.Ct. at 1848 (quoting *Palmore v. Sidoti*, 466 U.S. 429, 432, 104 S.Ct. 1879, 1881, 80 L.Ed.2d 421 (1984)).

Consequently, the Court has stated that " '[r]acial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination.' " *Id.* at 273, 106 S.Ct. at 1846 (quoting *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 291, 98 S.Ct. 2733, 2748, 57 L.Ed.2d 750 (1978)). This principle applies without regard to whether those discriminated against are members of a minority group or not. *Id.*

█ Briefly stated, any preference by a governmental agency that is based on racial or ethnic criteria violates the constitutional guarantee of equal protection unless it satisfies two requirements. First, it " 'must be justified by a compelling governmental interest.' " *Id.* at 274, 106 S.Ct. at 1847 (quoting *Palmore*, 466 U.S. at 432, 104 S.Ct. at 1882). Second, the means chosen to promote that interest must be " 'narrowly tailored to the achievement of that goal.' " *Id.* (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 480, 100 S.Ct. 2758, 2776, 65 L.Ed.2d 902 (1980).

### 1. *Compelling Governmental Interest*

In determining whether racial or ethnic preferences may play a role in a governmental agency's employment decisions, the

Supreme Court has drawn a clear line between situations in which there is evidence that the agency in question discriminated in the past and cases in which such evidence is lacking.

■ Preferences designed to remedy past discrimination by the *agency* are generally permissible. *See id.* at 274, 106 S.Ct. at 1847. In fact, in many cases, they may be required. *See, e.g., United States v. Paradise,* 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987).

On the other hand, a desire to make amends for past discrimination by *society* in general is not sufficient to justify such preferences. *Wygant,* 476 U.S. at 274, 106 S.Ct. at 1847. Thus, the Court has stated that:

> Before ... [a public employer] embarks on an affirmative-action program, ... it must have sufficient evidence to justify the conclusion that there has been prior discrimination [by that agency].

*Id.* at 277, 106 S.Ct. at 1848.

The Supreme Court has expressed a dual rationale for prohibiting preferences that are designed merely to remedy past *societal* discrimination. Part of that rationale is based on the conclusion that, in the absence of discrimination by the agency, its " 'nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired.' " *Id.* at 275, 106 S.Ct. at 1847 (quoting *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 340 n. 20, 97 S.Ct. 1843, 1857 n. 20, 52 L.Ed.2d 396 (1977)).

In addition, the Court has found that societal discrimination is "too amorphous" a basis for utilizing racial or ethnic classifications that adversely affect individuals who had nothing to do with such discrimination. *Id.* at 276, 106 S.Ct. at 1848. Thus, the Court has stated:

> No one doubts that there has been serious racial discrimination in this country. But as the basis for imposing discriminatory *legal* remedies that work against innocent people, societal discrimination is insufficient and over expansive. In the absence of particularized findings, a court could uphold remedies that are ageless in their reach into the past, and timeless in their ability to affect the future.

*Id.*

### 2. *Narrowly Tailored Means*

■ When past discrimination by the agency in question is established, some form of racial or ethnic preference is permissible. Accordingly, the Supreme Court has stated:

> We have recognized, however, that in order to remedy the effects of prior discrimination, it may be necessary to take race into account. As part of this Nation's dedication to eradicating racial discrimination, innocent persons may be called upon to bear some of the burden of the remedy. "When effectuating a limited and properly tailored remedy to cure the effects of prior discrimination, such a 'sharing of the burden' by innocent parties is not impermissible."

*Id.* at 280–81, 106 S.Ct. at 1850 (quoting *Fullilove,* 448 U.S. at 484, 100 S.Ct. at 2778).

However, the means adopted to remedy that discrimination "must be specifically and narrowly framed to accomplish that purpose." *Id.* at 279, 106 S.Ct. at 1850 (citing *Fullilove,* 448 U.S. at 480, 100 S.Ct. at 2775–76). They should not be shaped by subjective opinions or the zeal or lack of zeal of the people formulating them.

■ Of course, that does not prevent extreme measures from being adopted when circumstances warrant them. If a governmental agency has engaged in deliberate and pervasive discrimination, sweeping measures may qualify as narrowly tailored to provide the type of remedy required. *E.g., Paradise,* 480 U.S. at 185, 107 S.Ct. at 1074. It does mean that there must be a close connection between the degree, nature and extent of the prior discrimination and the extent to which racial and/or ethnic criteria are utilized to redress its effects. *Wygant,* 476 U.S. at 280, 106 S.Ct. at 1850. To put it another way,

one of the factors to be considered in determining whether a remedy is narrowly tailored to achieve a permissible purpose is whether "other less intrusive means" of accomplishing the purpose are available. *Id.* at 283–84, 106 S.Ct. at 1852.

Since concerns over the burden that race-based preferences impose on innocent parties is one of the factors underlying this proportionality requirement, the nature of the employment decision at issue has been held to bear on what dosage of medicine may be administered to cure the disease. In this connection, the Supreme Court has said that:

> In cases involving valid *hiring goals,* the burden to be borne by innocent individuals is diffused to a considerable extent among society generally. Though hiring goals may burden some innocent individuals, they simply do not impose the same kind of injury that layoffs impose. Denial of a future employment opportunity is not as intrusive as loss of an existing job.

*Id.* at 283, 106 S.Ct. at 1851 (emphasis added).

On the other hand, the Court has stated that:

> While hiring goals impose a diffuse burden, often foreclosing only one of several opportunities, *layoffs* impose the entire burden of achieving racial equality on particular individuals, often resulting in serious disruption of their lives. That burden is too intrusive.

*Id.* (emphasis added).

### B.   Title VII

In the area of affirmative action, Title VII apparently is viewed as somewhat less restrictive than the Equal Protection Clause at least insofar as voluntary affirmative action plans are concerned. *See Johnson v. Transportation Agency, Santa Clara County, Cal.,* 480 U.S. 616, 620 n. 2, 627 n. 6, 107 S.Ct. 1442, 1446 n. 2, 1449 n. 6, 94 L.Ed.2d 615 (1987). Title VII declares it unlawful for an employer "to fail or refuse to hire ... any individual ... because of such individual's race, color, religion, sex or national origin" or "to limit, segregate, or classify ... applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities ... because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e–2(a). However, the Supreme Court has stated that when an employer voluntarily selects minority applicants for employment "taking race into account [is] consistent with Title VII's objective of 'break[ing] down old patterns of racial segregation and hierarchy.'" *Johnson,* 480 U.S. at 628, 107 S.Ct. at 1450 (quoting *USW of America v. Weber,* 443 U.S. 193, 208, 99 S.Ct. 2721, 2730, 61 L.Ed.2d 480 (1979)).

■   Accordingly, the test for determining whether a voluntary affirmative action plan violates the prohibition contained in Title VII has been held to be somewhat different from that applicable under the Equal Protection Clause. *Id.* at 627 n. 6, 107 S.Ct. at 1449 n. 6. Under Title VII a voluntary affirmative action plan will pass muster if it satisfies two requirements. First, it must be "a temporary measure, not designed to maintain racial balance, but to 'eliminate a manifest racial imbalance.'" *Id.* at 630, 107 S.Ct. at 1451 (quoting *Weber,* 443 U.S. at 208, 99 S.Ct. at 2730). Second, it must not "'unnecessarily trammel the interests of the white employees,' ... [n]or ... 'create an absolute bar to the advancement of white employees.'" *Id.*

#### 1.   Manifest Imbalance

One of the greatest difficulties in applying this test is determining what constitutes the kind of "manifest racial imbalance" that justifies adoption of preferences. It is clear that "an employer seeking to justify the adoption of a plan need not point to its own prior discriminatory practices, nor even to evidence of an 'arguable violation' on its part. Rather, it need point only to a 'conspicuous ... imbalance in traditionally segregated job categories.'" *Id.* at 630, 107 S.Ct. at 1451 (citations omitted).

■   In deciding whether the kind of imbalance that exists justifies taking race or gender into account, the Supreme Court

has said that "a comparison of the percentage of minorities or women in the employer's work force with the percentage in the area labor market or general population is appropriate in analyzing jobs *that require no special expertise.*" *Id.* at 631–32, 107 S.Ct. at 1452 (emphasis added). On the other hand, the Court has stated that "where a job requires special training ... the comparison should be with those in the labor force who possess the relevant qualifications." *Id.* at 632, 107 S.Ct. at 1452.

### 2. *Unnecessarily Trammelling*

■ With respect to the second prong of the test, the Supreme Court has drawn the same distinction it draws under equal protection analysis between employment decisions that result in termination of an employee's existing employment and those that result in failure to hire a prospective employee. *Compare Wygant,* 476 U.S. at 282–83, 106 S.Ct. at 1851–52 *with Johnson,* 480 U.S. at 638, 107 S.Ct. at 1455–56. Failure to hire a nonminority applicant is far less likely to be deemed an action that unnecessarily trammels that applicant's interests because its effect is perceived to be less direct and less onerous. *See Johnson,* 480 U.S. at 638, 107 S.Ct. at 1455–56. Moreover, the Court has found that an affirmative action plan that leaves substantial numbers of whites free to compete or participate does not constitute "an absolute bar" to their advancement. *Id.* at 630, 638, 107 S.Ct. at 1451, 1455–56.

However, plans that rely on "reflexive adherence to a numerical standard" are not permissible. *Id.* at 637, 107 S.Ct. at 1455. Thus, the Court has distinguished between "goals" that "merely authorize[ ] that consideration be given to affirmative action concerns when evaluating qualified applicants" and "blind hiring" or "quotas" that are derived "solely by reference to statistics." *Id.* at 637–38, 107 S.Ct. at 1455–56.

### C. *The Instant Case*

■ In this case, there is no question that, in making selections for the July 24 school, the City has used race and gender as criteria by giving preferences to minorities and women. To its credit, the City has gone to considerable lengths to develop a validated testing procedure devised and administered by professionals. *Cf. Hammon v. Barry,* 826 F.2d 73, 79 (D.C.Cir.1987), *cert. denied,* 486 U.S. 1036, 108 S.Ct. 2023, 100 L.Ed.2d 610 (1988). Furthermore, only those whose test results classify them as "qualified" are considered for employment. *Cf. Johnson,* 480 U.S. at 623–24, 107 S.Ct. at 1447–48.

However, the range of test results suggests that, at least based on that standard of comparison, some may be more qualified than others. By definition, a validated test is one that purports to predict job performance. The higher an individual scores, the more proficient that individual is expected to be in performing the job. *Cf. Krupa v. New Castle County,* 732 F.Supp. 497, 499–500 (D.Del.1990). The City has tacitly accepted that premise by selecting applicants solely on the basis of their test scores up to the point at which that method makes it impossible to hire the number of minorities and/or women necessary to meet its affirmative action goals.

That does not mean that there is a perfect correlation between test scores and anticipated job performance or that test scores are the only factor predictive of such performance. The Fire Department officers who testified all stated that individuals achieving the highest test scores do not always make the best fire fighters. However, the City has offered no justification other than race or gender for departing from its usual practice in selecting the final 12 participants in the school. Indeed, it has candidly acknowledged that race and gender were the only factors taken into account. That triggers analysis under strict scrutiny standards and requires the City to present "a strong basis in evidence for its conclusion that remedial action was necessary." *Wygant,* 476 U.S. at 277, 106 S.Ct. at 1848; *Johnson,* 480 U.S. at 626–27, 107 S.Ct. at 1449.

### 1. *Past Discrimination by Fire Department*

The City relies entirely on the statistical disparity between the percentage of minori-

ties and/or women in the Fire Department and their representation in the general population which is especially pronounced insofar as women are concerned.[2] That may or may not be sufficient to establish the type of "manifest imbalance" necessary to pass muster under Title VII. But it provides little evidence of past discrimination *by the Fire Department* which is required under the Equal Protection Clause to justify the use of racial or ethnic classifications.

As previously noted, the Supreme Court has stated that there may be many reasons for such a disparity other than discrimination. *See City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 725–26, 102 L.Ed.2d 854 (1989). The underrepresentation of women, for example, may be due to the physical strength required or a less wide spread desire to become fire fighters. The plaintiffs also allude to the possibility that some minority groups include large numbers of recent immigrants who have not yet obtained high school equivalency certificates. Indeed, the possibility of dramatic increases in the size of such groups due to recent immigration would bear on whether their underrepresentation is due to sudden demographic changes or past discrimination by the Fire Department.

At this stage, there is no evidence apart from such statistical disparity that suggests past discrimination by the Fire Department. On the contrary, the City has been unable to point to any complaints or findings of such discrimination, and Fire Department officials expressly deny that the department discriminates. In fact, the record establishes that the Fire Department (and the City) has had an affirmative action program in place for 14 years. The Court is unable to determine what progress has been made under that program because no monitoring reports have been provided. One thing that is known is that, under the

plan, 25% of those admitted to the last school in 1987 were minorities and/or women. Another is that the Fire Department has made what its officials described as vigorous efforts to solicit and recruit minority applicants. These facts seem to be inconsistent with the conclusion that the Fire Department has been guilty of discrimination.

### 2. *Reflexive Adherence to Statistics—Quotas*

As previously noted, in those cases where preferences are permissible, they must be incorporated into plans that have flexible goals rather than rigid quotas regarding minority hiring. *Johnson,* 480 U.S. at 636–38, 107 S.Ct. at 1454–56. In attempting to distinguish between the two, one relevant inquiry is whether the plan "earmarks" positions for any one group or whether membership in that group is merely "one of several factors that may be taken into account in evaluating qualified applicants." *Id.* at 641, 107 S.Ct. at 1457.

In this case, it appears that the City began with the premise that 20% of the applicants selected to attend the July 24 school would be minorities and/or women if a sufficient number of them passed the written and physical agility tests. That determination was made at a February 4, 1991 meeting attended by the Mayor, Fire Department officials and other members of the City Administration. No explanation has been offered as to how that figure was arrived at except to say that it was based on similar figures utilized by prior administrations.

Furthermore, in setting that figure no restriction was placed on how far down the ranking list the City would go in order to achieve its goal. As matters now stand, the twelfth minority and/or woman selected in order to reach the 20% figure is No. 373 on the list. In this respect, this case

---

**2.** At the present time, three women are employed in administrative positions. They represent less than 1% of the total force. There are no female fire fighters. The extent of any disparity with respect to minorities depends on what population sample is used. Minorities make up 6% of the Fire Department and 42.48%

of the population of Providence and 10.7% of the population of the State of Rhode Island. For purposes of this motion, the Court need not determine whether the relevant general population statistics are those of the City of Providence or of the larger and less heterogeneous metropolitan area from which applicants are drawn.

appears to be unlike *Johnson* where race, ethnicity, and/or gender were merely taken into account as a "plus" factor and more like *Bakke* where it was determinative. Here, the system of preference utilized bears some of the indicia of a quota or an inflexible adherence to a preordained numerical standard.

## CONCLUSION

In summary, no fair-minded person of goodwill would take issue with an employer's voluntary efforts to achieve a work force that fairly reflects the racial, ethnic and/or gender composition of that portion of the general population possessing the necessary job qualifications. However, the law establishes limits regarding the methods that may be utilized in attempting to reach that goal. Those methods may span the spectrum from efforts to vigorously recruit minorities and women to giving such applicants some form of special consideration. When those methods include preferences based on race, ethnicity and/or gender, they must be strictly scrutinized to ensure that they do not unreasonably discriminate against individuals who are not members of the favored groups. Specifically, those methods must satisfy the standards established by the Supreme Court pursuant to Title VII and the Equal Protection Clause of the Fourteenth Amendment.

In this case, the City's desire to include more minorities and women in its Fire Department is readily understandable and even commendable. However, there are serious questions as to whether the method for selecting applicants to attend the July 24 school satisfies the applicable requirements. That is especially true with respect to the test adopted by the Supreme Court under the Equal Protection Clause.

As previously noted, there has been no showing of past or present discrimination by the Fire Department. Furthermore, the preferences utilized appear to be nothing more than rigid adherence to a fixed goal of admitting a specific and preordained percentage of minorities and women to the July 24 school without a sufficient explanation as to how that percentage was derived.

Insofar as Plaintiff Gross is concerned, those questions create a sufficient likelihood of success to warrant injunctive relief because the balancing of the harms component of the preliminary injunction test weighs heavily in his favor. That is to say, he has demonstrated that, but for the 20% setaside, he would almost certainly be admitted to the July 24 school. Moreover, he has established that the failure to admit him will, at the very least, permanently deprive him of seniority rights vis-a-vis the other members of that class. Additionally, admitting him to the school will not harm the City in any way since there is an available slot, and the City has expressed an intention to hire approximately 140 additional fire fighters within the next year.

On the other hand, the questions raised with respect to the selection process are not sufficient to warrant injunctive relief for the remaining plaintiffs. Even if the City were prohibited from giving race, ethnicity or gender any consideration whatever in the selection process, none of the remaining plaintiffs would be selected for the July 24 school since none of them is ranked any higher than No. 81. Therefore, the remaining plaintiffs have not demonstrated that they will suffer any irreparable harm if the school is allowed to proceed or that they will benefit in any way from an order enjoining the school. However, such an order would result in considerable expense to the City in overtime costs necessary to meet minimum staffing requirements and would work a hardship on those individuals who have been selected to attend the school.

For all of the foregoing reasons, the plaintiffs' motion for a preliminary injunction enjoining the school scheduled to begin on July 24 is denied. However, the City is ordered to include Russell G. Gross in that school if he satisfactorily completes the physical examination, psychological evaluation and police background check required of all attendees.

IT IS SO ORDERED.