Terrence B. QUIRIN, Plaintiff,

v.

CITY OF PITTSBURGH and the Pittsburgh Civil Service Commission, Defendants.

Civ. A. No. 91–591.

United States District Court, W.D. Pennsylvania.

Sept. 17, 1992.

---

Samuel J. Cordes, Pittsburgh, Pa. for plaintiff.

Robert B. Smith, Marianne S. Malloy, City of Pittsburgh, Law Dept., Pittsburgh, Pa., for defendants.

## MEMORANDUM ORDER

D. BROOKS SMITH, District Judge.

Terrence B. Quirin filed a complaint on April 8, 1991, alleging that the defendants City of Pittsburgh and the Pittsburgh Civil Service Commission denied him equal protection of law under the Fourteenth Amendment, thereby violating 42 U.S.C. § 1983, and discriminated against him in the terms of employment, thereby violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Specifically, Quirin alleges that because the City has since 1987 maintained a one-third quota for female firefighter applicants regardless of qualification, he was denied employment as a firefighter in the April, 1990 round of new hires. Before the Court in this matter is Quirin's motion for partial summary judgment on the issue of liability and the defendants City of Pittsburgh and Pittsburgh Civil Service Commission's cross-motion for summary judgment. Because the relevant facts are not in dispute and plaintiff is entitled to judgment as a matter of law, plaintiff's motion is granted. If the parties cannot stipulate to a final order granting relief, they shall notify the Court within ten days.

### I. Facts

Quirin applied on February 19, 1989, with the Pittsburgh Civil Service Commission to test for a position as firefighter for the City of Pittsburgh. In March, 1989, Quirin passed the written examination with a score of 100%. In June, 1989, Quirin passed the physical performance portion of

the firefighter examination with a score of 95.8%, and also passed various required medical examinations. Quirin's written and physical performance examinations were averaged, giving plaintiff a final grade of 97.4%. .

Pursuant to the Firefighter's Civil Service Act, 53 P.S. §§ 23491, 23493.1, Pittsburgh firefighters are considered for appointment and hired in order from an eligibility list in which candidates are ranked from highest to lowest based solely on the average of their scores on the written and physical performance examinations. The Civil Service Commission, upon notification by Pittsburgh that it will hire firefighters, forwards the names of the number of top-ranked candidates equal to the number of positions to be filled to the Director of the Department of Public Safety. The Director of Public Safety has no discretion in hiring from the list, except for the rare objection for cause, a matter not relevant to this suit.

On July 28, 1987, the Civil Service Commission adopted a policy requiring no less than one third of all new hires to be female. The Civil Service Commission's expressed reason for adopting the policy was its desire to "overcome the effects of past discriminatory hiring practices enforced by the Commission." Plaintiff's Brief, Appendix 2. According to Michele Cunko, Pittsburgh's assistant director of the department of personnel, she and John Bingler, Esq., then President of the Civil Service Commission, decided informally that after *Johnson v. Transportation Agency*, 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987), and *Chmill v. City of Pittsburgh*, 488 Pa. 470, 412 A.2d 860 (1980), voluntary affirmative action based on gender was possible. Cunko deposition, 35–36; Bingler Deposition 12–13. Also, some members of the Commission believed that the requirement of 53 P.S. § 23493.1(f), which mandates that any person who served in the armed forces of the United States would have 10 points added to his or her examination score, caused a "discriminatory effect"

in favor of males. Bingler deposition, 13–14; Cunko deposition, 41–44. Without holding a hearing or conducting an investigation, the Civil Service Commission chose to adopt the one-third figure.[1]

Prior to the application of Title VII to state and local governments in 1972, the City of Pittsburgh had discriminated against female applicants for the job of firefighter. Since the position of firefighter was open to female applicants, beginning in the mid–1970's, the City of Pittsburgh has conducted an advertisement and recruitment campaign designed to attract women applicants. Cunko deposition, 38.

In 1975, 32 females applied for firefighter, 29 females took the examination, and one female passed the examination. As a result of an *ad hoc* decision described in the record only as selective certification, the one female was hired. In 1978, 303 females applied for firefighter, 103 females took the examination, and 6 females passed the examination. No female was hired from the 1978 eligibility list. In 1984, 618 females applied for firefighter, 263 females took the examination, and 82 females passed the examination. In September, 1987, 10 women from the 1984 eligibility list were hired together with 20 men, to fill 30 vacancies in the position of firefighter. If not for the Civil Service Commission's one-third set aside for female applicants, the names of the ten females hired from the 1984 eligibility list would not have been reached for pre-employment medical processing. In 1988, either 504 or 512 females[2] applied for firefighter, 144 females took the examination, and 101 females passed the examination. Pursuant to the Civil Service Commission's one-third set aside for female applicants, 12 of the 36 firefighter positions filled in April, 1989, were women and 9 of the 24 filled in April, 1990, were women.

The City of Pittsburgh maintains a residency requirement for the post of firefighter. Cunko depo., 46. The relevant work force population, therefore, is that of the

---

**1.** Figures ranging from 30% to 50% were proposed. Cunko deposition, 44–45.

**2.** The defendants' answers to interrogatories are inconsistent.

City of Pittsburgh. As of March, 1990, the work force population of the City of Pittsburgh was 52.5% male and 47.5% female. *See Commonwealth of Pennsylvania v. Flaherty*, 760 F.Supp. 472, 478 (W.D.Pa. 1991).

Statistics for firefighter applicants show that in 1988, a total of 3,518 people applied for the position of firefighter. Of these, 2,902, or 85.2%, were males, and 504, or 14.8%, were females.[3] In 1991, 2,007 people applied, 1,700 male, 291 female and 16 unknown. This yields applicant percentages of 85.4% male and 14.6% female.

Since at least 1985, the City of Pittsburgh's written tests for the position of firefighter have been validated, are job-related, and are not challenged in this action. Additionally, since at least 1983, the firefighter tests administered by the Civil Service Commission have exhibited no adverse impact for gender as defined by the EEOC's Uniform Guidelines on Employee Selection's four-fifth (4/5) rule. *See* 29 C.F.R. § 1607.4.

On March 16, 1990, the Civil Service Commission submitted to Glenn Cannon, Director of Public Safety, a list of 24 names to fill 24 open positions as first year firefighter. This list included the names of 15 males and 9 females. The lowest-ranked male on the list had a score of 97.5 and was ranked no. 68 on the eligibility list.[4] The highest-ranked female certified had a score of 92.6 and was ranked no. 376 on the list. Plaintiff's score of 97.4 placed him at no. 69 on the eligibility list. But for the challenged policy, Quirin would have been hired.

## II. Standard of Review

▌ In the economists' hypothetical world of zero transaction costs and instantaneous market adjustments, affirmative action and reverse discrimination would not be issues, because each person affected by past discrimination would be able to obtain a remedy directly from the discriminating party. In the judges' world, where changes in legal rules have neither immediate nor complete effectiveness, two problems arise in determining the permissible scope of policies designed to eliminate the effects of past discrimination. First, the beneficiaries of the new policy are frequently unrelated except in the most tenuous way to the victims of previous discrimination; and second, the victims of the new policy almost never were beneficiaries of the previous discrimination. It is therefore necessary, strictly as a matter of justice, to scrutinize closely all employment policies which facially discriminate on the basis of race, gender, ethnic group, or religion. *See Regents of the University of California v. Bakke*, 438 U.S. 265, 291, 295–96, 98 S.Ct. 2733, 2748–49, 2751, 57 L.Ed.2d 750 (1978). This is so even where the policy is deemed to be remedial. As Justice Stevens stated in dissent in *Fullilove v. Klutznick*, 448 U.S. 448, 539, 100 S.Ct. 2758, 2806, 65 L.Ed.2d 902 (1980):

> If there is no duty to attempt either to measure the recovery by the wrong or to distribute that recovery within the injured class in an evenhanded way, our history will adequately support a legislative preference for almost any ethnic, religious, or racial group with the political strength to negotiate 'a piece of the action' for its members.

As the plurality and Justice Scalia in *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), and Justice Stevens in *Fullilove v. Klutznick*, suggest, it is always necessary as a preliminary matter to examine whether the policy in question is truly "benign reverse discrimination"—that is, an advantage given by groups in power to a group without access to power sufficient to prevent discrimination against its members—or whether the policy is simply "turnabout is

---

**3.** One Hundred Twelve (112) of the candidates in 1988 did not provide gender information and therefore will not be counted in the determination of these statistics.

**4.** Three hundred seven men had higher test scores and were therefore ranked higher than the highest female firefighter certified for the April, 1990, class. The lowest ranked firefighter hired, a woman, had a score of 85 and was ranked 966, 897 places below Quirin.

fair play," *see Richmond v. J.A. Croson Co.,* 488 U.S. at 524, 109 S.Ct. at 737 (Scalia, J., concurring), by a group now in power. *See also Regents of the University of California v. Bakke,* 438 U.S. at 295–96, 98 S.Ct. at 2751 ("The concepts of majority and 'minority' necessarily reflect temporary arrangements and political judgments.") When even "legislative assurances of good intention cannot suffice," *Richmond v. J.A. Croson Co.,* 488 U.S. at 500, 109 S.Ct. at 724, to support a facially discriminatory policy in the absence of a narrowly fitted remedy to an empirically demonstrated evil, certainly less of a presumption of legitimacy should be afforded where the good intentions themselves appear to be based on a "stereotype rather than fact or reason," 488 U.S. at 516, 109 S.Ct. at 733 (Stevens, J. concurring), that women need quotas wherever their progress is not deemed satisfactory.

In *Johnson v. Transportation Agency,* 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987), the Supreme Court held that a voluntary policy adopted by a municipal agency which expressly considered race and gender in hiring and promotion decisions was permissible under Title VII, despite the absence of any showing of past discrimination based on race or gender. The Court stated that·a plan with the goal of eliminating work force disparities in historically imbalanced job categories was a permissible one, providing that it did not rely on "reflexive adherence to a numerical standard" or "unnecessarily trammel" the rights of applicants and employees not in the group favored by the plan. 480 U.S. at 637, 107 S.Ct. at 1454. *See also Steelworkers v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979).

Two terms later, in *Richmond v. J.A. Croson Co.,* the Court held that a municipality's set-aside for construction contracting business owned by minorities violated the constitutional guarantee of equal protection where the remedy chosen was not narrowly tailored to remedy the effects of prior discrimination. A plurality of four (Justice O'Connor, joined by the Chief Justice, Justice White and Justice Kennedy) stated that proper empirical findings were necessary to define the scope of the injury from past discrimination and the permissible extent of the remedy necessary to cure its defects.[5] 488 U.S. at 510, 109 S.Ct. at 729–30.

### III. Analysis

 Scrutinizing the City of Pittsburgh's policy in the light cast by *Johnson v. Transportation Agency,* and *Richmond v. J.A. Croson Co.,*[6] it is clear that while Pittsburgh may voluntarily adopt methods solely to increase the number of women firefighters as a response to the effects of former discrimination, the particular policy it adopted in 1987 runs afoul of both Title VII and the equal protection clause of the Fourteenth Amendment, and cannot be applied to foreclose Quirin's right to equal protection of the law.

### A. *The empirical basis for the City's policy*

Four salient facts are acknowledged as undisputed:

(1) there is no evidence in the record of discrimination against women applying for the position of firefighter after 1972, twenty years ago.

(2) although the City has conducted, since approximately 1976, a recruitment and advertising effort aimed solely at increasing the number of women applicants, and despite the existence, since 1987, of a guarantee of 33% of new hires, only about 15% of the applicants for the post of firefighter are women.

(3) the tests used by the City of Pittsburgh to evaluate applicants for the position of firefighter are validated, job relat-

---

5. Justice Scalia, who concurred in the judgment, would only approve a race conscious set-aside to remedy a party's own discrimination, regardless of empirical findings.

6. Analysis of the Pittsburgh policy has also been illuminated by three recent opinions, *Bertoncini v. Providence,* 767 F.Supp. 1194 (D.R.I.1991), *Commonwealth of Pennsylvania v. Flaherty,* 760 F.Supp. 472 (W.D.Pa.1991), and *Krupa v. New Castle County,* 732 F.Supp. 497 (D.Del.1990).

ed, and have no discriminatory impact on women.

(4) the reason that women were not being hired in proportion to the number of women applying for the position of firefighter until the introduction of the challenged set-aside policy in 1987, was the greater number of men benefiting from the 10 point veteran's preference provided by Pennsylvania state law.

■ Veterans preferences have long been held constitutional, *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), and are part of Pennsylvania law. 53 P.S. § 23493.1(f). The availability of military service as an option to women gives the same opportunity to women as to men to benefit from this preference, and women applicants for the positions of firefighter who are veterans receive the benefit of Pennsylvania law. In the twenty years since 1972, therefore, any gender difference in the number of veterans in the firefighters hired from the applicant pool cannot on this record be ascribed to the effects of pre–1972 discrimination. Although an affirmative finding of a basis for the imbalance in applications is unnecessary for disposition of this matter, it appears obvious that the reason for the greater number of men at the top of the hiring lists is that men in greater numbers than women enter the military, and thereby obtain the quite lawful benefit of a veteran's preference.

It is further a fair conclusion from the evidence that the defendants made no attempt to investigate the current existence of discrimination against women applicants, but rather that the 1987 policy was instituted because of the frustration of certain nonelected officials with the number of male applicants taking advantage of Pennsylvania's veteran's preference in the selection process. Cunko deposition, 37; Bingler deposition, 13–14.

B. *The closeness of fit of the City's remedy*

■ Initially, the city asserts that the 1987 policy is not a quota. The city reach-

es this conclusion by asserting that because everyone hired as a firefighter must demonstrate minimal competency, gender is merely being used as a tie-breaker. *See Johnson v. Transportation Agency,* 480 U.S. at 636–38, 107 S.Ct. at 1454–55. This position is not tenable. To begin with, the policy starts with the premise that a fixed proportion of each class will be females. Second, although the command of Pennsylvania law that hiring be in rank order from the eligibility list suggests that as a matter of law the applicants are not considered to be equally qualified once they achieve a minimum score, *see also* Bingler deposition, 50, there is no limit in the policy on how far down the list the City will go to achieve its goal. *See Bertoncini,* 767 F.Supp. at 1203. There can be no doubt that the 1987 policy was conceived as a quota and is being applied as a quota.

■ *Richmond v. J.A. Croson Co.* suggests that to the extent that a quota can be maintained in the absence of any demonstrable history of discrimination by the agency affected by the policy, there should be: (1) some empirical foundation for the necessity of the remedy chosen; (2) the duration of the remedy should be limited in time; and (3) the remedy should be precisely limited to counteract the injury addressed. *And see* 488 U.S. at 519, 109 S.Ct. at 735 (Kennedy, J., concurring). The city's quota fails in each of these respects.

■ First, it again must be emphasized that the one-third figure chosen by the city was not preceded by an investigation or public hearing. In fact, the evidence of record in this matter indicates that even with a quota in place guaranteeing 33% of firefighter positions to female applicants, only 15% of the applicants for the position of firefighter are women. Whatever justification exists for a permissible quota, it cannot be so stretched as to justify a set-aside more than 100% greater than the percentage of the interested applicant pool. *See EEOC v. Chicago Miniature Lamp Works,* 947 F.2d 292, 302 (7th Cir.1991) (relevant labor market in a Title VII case

**1492**

requires identification of the interested potential applicants).

Second, there is no expiration date or other time limitation for the quota, except for the expression of the aspiration that it will be "temporary until the effects of past discrimination are overcome." Plaintiff's Exhibit 2, at 2. The lack of foundation for the assumption of post–1972 discrimination has already been discussed. Counsel for the defendants at oral argument in this matter further stated that due to the City's infrequent hiring, the policy could continue "throughout our lifetimes" without reaching its goal, which counsel suggested could be a 33% representation of women in the fire department. The absence of any official criterion defining success and therefore allowing termination of the quota system, or even a procedure for reevaluation of the need for the quota is a serious flaw under *Richmond v. J.A. Croson Co.*

Third, the quality referred to by the Supreme Court in *Richmond v. J.A. Croson Co.*, as "narrow tailoring," and described in other contexts as consideration of less restrictive alternatives, is missing from the defendants' policy. Because the only discrimination identified by the City of Pittsburgh was its pre–1972 exclusion of women from the position of firefighter, a quota could possibly have been justified in the years immediately following 1972, tapering perhaps to a *Johnson v. Transportation Agency*-type "plus factor," and thence to selective advertising and recruitment of women candidates. The City, however, as it travels farther from its former exclusion of women from the position of firefighter, has become more and more extreme in its response. Methods which do not result in shifting the entire burden to individuals who, like Quirin, were completely innocent of the City's former policy, such as attempts to sponsor or recruit women military veterans or to provide additional coaching for women applicants, do not appear even to have been considered. Judging from the defendants' representative's explanation for their actions, this lack of exploration of alternatives appears to have occurred because the goal was achieving a fixed proportion of female firefighters and not simply overcoming the effects of discrimination.

In judging the appropriateness of the fit of the City's policy, it is also noteworthy that the quota was imposed not as part of a general policy of eradicating gender imbalance in City jobs, but only to increase the proportion of women in a City job with a high proportion of men. A policy which would be invalid when applied narrowly to one job description might be sustainable if imposed as a more global solution to the general problem of gender imbalance in public jobs.

IV. Conclusion

■ The constitution and Title VII require that preferential treatment for a class defined by ethnicity or gender, even when justifiable because of a showing that the effects of past discrimination linger, must be tailored to minimize the burden to innocent members of the class not receiving the preference. *See Newark Branch, NAACP v. Town of Harrison, N.J.,* 940 F.2d 792, 807 (3d Cir.1991), *citing United States v. Paradise,* 480 U.S. 149, 171, 107 S.Ct. 1053, 1066, 94 L.Ed.2d 203 (1987). The City is free to employ a variety of means to attempt to attract more women to the position of firefighter.[7] It may not do so on the back of Terrence Quirin.

---

**7.** It must be stressed that this matter challenges the application of this quota to an individual plaintiff. Whether the City's policy could be adopted upon a proper showing of necessity or whether any other individual plaintiff would be able to prove injury in fact from the City's policy are questions not at issue.