Alan A. PEIGHTAL, Plaintiff,

v.

METROPOLITAN DADE COUNTY, Metropolitan Fire Department of Dade County, Defendants.

No. 86–2350–CIV.

United States District Court, S.D. Florida.

Feb. 24, 1993.

Alexander Kapetanakis, Rassner, Rassner, Kramer & Gold, South Miami, FL, for plaintiff.

John McInnis, Asst. County Atty., Dade County Attorney's Office, Miami, FL, for defendant.

## MEMORANDUM OPINION AND ORDER

HIGHSMITH, District Judge.

This action arises from Metropolitan Dade County Fire Department's ("Fire Department") rejection of Alan Andrew Peightal's application for employment as a firefighter in October, 1983. In March, 1986, Peightal filed a racial discrimination charge with the Equal Employment Opportunity Commission ("EEOC"). The EEOC concluded that the Fire Department's employment decision was not unlawful because it complied with the Commission's affirmative action guidelines. Peightal then filed the complaint in this action, alleging violations of: (1) Title VII of the Civil Rights Act of 1964; and (2) the Equal Protection Clause of the Fourteenth Amendment.

This Court conducted a non-jury trial on the issue of liability in January, 1988, and found that the Fire Department's affirmative action program did not violate either Title VII or the Fourteenth Amendment. Thereafter, Peightal appealed to the Eleventh Circuit. The Eleventh Circuit found that the affirmative action plan did not violate Title VII, but it remanded the Equal Protection claim to this district court for reconsideration in light of *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). *Peightal v. Metropolitan Dade County*, 940 F.2d 1394 (11th Cir.1991).

The Court conducted a second bench trial on January 11, 1993. Having reconsidered the evidence presented at the original trial of this matter, as well as the new evidence presented at trial on remand, having heard the arguments of counsel, and being other-wise fully advised in the premises, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

*I. Facts Established at the Original Trial and Adopted by the Eleventh Circuit on Appeal*

1. Alan Andrew Peightal is a United States citizen and a resident of Dade County, Florida.

2. Metropolitan Dade County is a political subdivision of the state of Florida. The County operates the Metropolitan Fire Department of Dade County ("Fire Department"). The Fire Department did not file an answer, although it was an originally named defendant, because the legal entity responsible for fire service in the county is Metropolitan Dade County.

3. On October 18, 1983, Peightal, a white male, applied for a position as a firefighter with the Fire Department. Peightal took the entry-level firefighter examination and received a score of 98.25. This was the twenty-eighth highest score for that examination. In other words, twenty-seven individuals scored higher than Peightal on the examination.

4. The position of firefighter is an entry-level job that does not require any specialized skills or training. All applicants, however, must satisfy seven basic requirements:

  a. a high school diploma or its equivalent;

  b. a driver's license and the ability to obtain a chauffeur's license;

  c. a minimum age of 18 years;

  d. a physical capabilities test;

  e. a medical examination;

  f. a personal interview; and

  g. corrected vision in both eyes of at least 20/40.

5. Applicants are eligible to take the firefighter examination if the applicant meets the age and the high school graduation requirements.

6. In 1983, the Fire Department performed an analysis of its work force. This

analysis revealed the following percentages (rounded to the nearest whole number):

### Fire Department Work Force

| Year | Firefighters | White | Black | Hispanic | Female |
|------|------|------|------|------|------|
| 1965 | 121 | 99% | 1% | 0% | 0% |
| 1975 | 499 | 89% | 8% | 3% | 0% |
| 1983 | 921 | 75% | 12% | 14% | 1% |

7. The general population of Metropolitan Dade County with respect to these groups was as follows:

### General Population of Metropolitan Dade County, Florida

| Year | White | Black | Hispanic | Female |
|------|------|------|------|------|
| 1965 | 69% | 15% | 16% | 52% |
| 1975 | 52% | 15% | 32% | 52% |
| 1983 | 47% | 17% | 36% | 52% |

8. The Fire Department decided to adopt an affirmative action program calling for the selection of firefighters from six separate categories: white males, white females, black males, black females, Hispanic males, and Hispanic females. Applicants received rankings within these categories on the basis of their test scores. The Fire Department then hired in accordance with numerical goals, which were based on an analysis of the number of anticipated openings, the probable number of qualified applicants available in each category, and the extent of underrepresentation in each category.

9. The long-term goal of the affirmative action plan was to partially relieve the underrepresentation of minorities and women in the Fire Department. In order to meet this goal, the Fire Department adopted a "70%" rule. This rule states that a significant disparity between minority representation in the Fire Department and in the general population may be deemed to exist if the percentage of a particular minority group in the Fire Department is not at least 70% of the available labor pool. Once the 70% goal is reached, then a significant disparity no long-er exists, and the preferential hiring program comes to an end.

10. In 1983, the Fire Department's affirmative action plan listed the following goals for its firefighter recruits:

a. Black males: 15
b. Hispanic males: 29
c. Black females: 8
d. Hispanic females: 8
e. White females: 7

11. In 1983, the Fire Department actually hired 86 new firefighters. This class of incoming recruits can be broken down as follows:

a. Black males: 18
b. Hispanic males: 24
c. Black females: 5
d. Hispanic females: 4
e. White females: 12
f. White males: 23

### B. Supplemental Findings of Fact After Trial on Remand

1. The Fire Department made several attempts to increase minority representation through race-neutral means before adopting the affirmative action plan. According to the credible testimony of Jacquelyn Rowe, the

former Director of the Fire Department's Affirmative Action Office, recruiters were sent to high schools and college campuses to encourage minority students to become firefighters. In addition, the Fire Department designated a recruitment specialist to make presentations at job fairs and career days at local colleges and high schools. These efforts also included outreach programs by minority members of the Fire Department.

2. The Court finds that these well-intentioned recruitment efforts achieved limited success. The Fire Department's evaluation of test scores for entry-level applicants, however, showed that this focused recruitment would not be sufficient to solve the problem of underrepresentation of women and minorities in the Fire Department. The passing rate for the test in 1983 was 70%. Only applicants who passed the test were considered eligible for employment offers. If the Fire Department had continued to hire new firefighters in strict accordance with the test-ranked eligible list of applicants, then only a handful of minorities would have been hired. Of the 100 highest-scoring applicants in 1983, only six were Hispanic, one was female (number 100), and none were black.

3. The following statistical evidence compares the Fire Department's work force with the population of Dade County between the ages of 18 and 55 (rounded to the nearest whole number): [1]

### General Population Aged Between 18 and 55

| Year | White | Black | Hispanic |
|------|-------|-------|----------|
| 1970 | 57% | 15% | 28% |
| 1975 | 49% | 16% | 34% |
| 1980 | 43% | 17% | 38% |
| 1983 | 38% | 18% | 42% |

### Fire Department Work Force

| Year | White | Black | Hispanic |
|------|-------|-------|----------|
| 1970 | 97% | 2% | 1% |
| 1975 | 89% | 8% | 3% |
| 1980 | 80% | 10% | 10% |
| 1983 | 75% | 12% | 14% |

### Difference Between Fire Department Work Force and Available Labor Pool

| Year | White | Black | Hispanic |
|------|-------|-------|----------|
| 1970 | 40% | –12% | –27% |
| 1975 | 40% | – 9% | –31% |
| 1980 | 37% | – 8% | –28% |
| 1983 | 37% | – 6% | –29% |

### Percent Deviation Between Department Work Force and Available Labor Pool

| Year | White | Black | Hispanic |
|------|-------|-------|----------|
| 1970 | 70% | –84% | –96% |
| 1975 | 82% | –53% | –91% |
| 1980 | 85% | –44% | –73% |
| 1983 | 97% | –34% | –68% |

---

1. All firefighter applicants must be 18 or older, and the Fire Department does not receive applications from persons over the age of 55. Therefore, these statistics are more refined than the general population data considered at the first trial of this matter.

4. The Court heard testimony from the Fire Department's statistics expert, Dr. David Santisteban. The Court finds Dr. Santisteban's testimony to be credible. Therefore, the Court finds, through the unrebutted testimony of Dr. Santisteban, that statistical evidence regarding visual acuity and high school graduation rates—two additional criteria for the selection of firefighters—was not available for the general population of Dade County from the United States Census Reports in 1983.

5. In 1983, the Fire Department employed 921 firefighters. If all applicants had previously been given an equal opportunity for selection from the relevant labor pool, there would have been 391 Hispanic firefighters and 165 black firefighters. In 1983, however, the composition of the Fire Department included only 127 Hispanic firefighters and 109 black firefighters. Dr. Santisteban credibly testified that the difference between the expected percentage of blacks in the Fire Department—given the percentage in the available labor pool—and the actual percentage was *4.8* standard deviations. Applying the same criteria, the difference between the expected percentage of Hispanics in the Fire Department—given the percentage in the available labor pool—and the actual percentage was *17.6* standard deviations. Dr. Santisteban further testified that the occurrence of more than two or three standard deviations falls outside the possibility of chance. According to Dr. Santisteban, 17.6 standard deviations would occur by chance only once in every one billion cases.

6. In 1984, a study conducted by the Human Services Institute, under contract with Metropolitan Dade County, concluded that the selection procedures used by the Fire Department were deficient in their ability to predict future job performance.[2] By comparing test scores with subsequent performance in fire college and first year on-the-job performance evaluations, the study concluded that the firefighter test was simply not a valid predictor of subsequent job performance.

In addition, the report stated that a number of the selection procedures, especially the written test, had an adverse impact upon minorities. Specifically, the study's analysis of the written test found that the white male passing rate was 85%, the black male passing rate was 56%, the Hispanic male passing rate was 23%, and the female passing rate was 42%.

7. The report also focused on the physical capability test. It showed that the Hispanic male passing rate was 94%, the white male passing rate was 90%, the black male passing rate was 76%, and the female passing rate was 19%. Dr. Santisteban testified at trial that the physical capability test had an adverse impact on women, and the swimming component of the test had an adverse impact on blacks. According to the study, the physical capability test bore no relationship to the physical exertions required of a firefighter. For instance, females had difficulty scoring well in a component of the test that required the applicants to complete a 1.5 mile run within certain time limits. Firefighters, however, do not have to run a mile as part of their job routine. Firefighters do have to run up flights of stairs carrying hoses. The study suggested, therefore, that this type of practical test would better assess an applicant's ability to perform the on-the-job requirements demanded of firefighters.

8. Prior to the adoption of the affirmative action plan, the Fire Department had been subject to a number of allegations of racial discrimination. According to the credible testimony of Jacquelyn Rowe, the former affirmative action officer, there were several discrimination complaints concerning the entry-level application procedures in the early 1980s. Some of these complaints culminated in a lawsuit filed by an organization of black firefighters, the Progressive Firefighters Association ("PFA"). The lawsuit was eventually resolved through a settlement agreement between the PFA and Metropolitan Dade County. The settlement agreement, signed

2. The Institute issued the study, entitled, "Job Analysis and Selection Procedures Study for the Positions of Firefighter, Administrative Officer I, and Social Worker I," in April, 1984. Dr. David Santisteban, the Project Director, submitted the Final Report to Metropolitan Dade County.

in 1982, required the validation of the Fire Department's testing procedures and the establishment of a special recruitment team to actively recruit black applicants.

9. The Fire Department did not, as a general practice, screen each applicant's claim of membership in a specific minority group. In other words, the application form was self-identifying. For example, if an applicant noted on an application form that he or she was Hispanic, then the Fire Department accepted this self-identification without question. Should another applicant or employee challenge the asserted minority status of an applicant, then the affirmative action office would investigate the claim by applying the EEOC guidelines to the applicant. Pursuant to these guidelines, the affirmative action office would ask the applicant to supply a birth certificate, supply a marriage certificate, or demonstrate cultural or linguistic ties to Hispanic heritage. The affirmative action office used family ties, linguistic accent, and Spanish language capabilities as indicia of Hispanic heritage.

10. According to the credible testimony of Jacqueline Rowe, as well as that of Marcia Saunders, the current Director of Affirmative Action, a number of challenges to applicants' minority status arose subsequent to the initiation of the affirmative action plan. The witnesses stated that all of these challenged minority applicants were pronounced qualified for affirmative action. For instance, the witnesses recounted several situations where Hispanic female applicants had married non-Hispanic men, thereby taking non-Hispanic surnames. There were also a few challenges against applicants who had Anglo surnames, but spoke Spanish or were actually born in Spanish-speaking countries. No written documentation of these challenges, however, was presented at trial.

## CONCLUSIONS OF LAW

### Equal Protection Standard of Review

The Equal Protection Clause of the Fourteenth Amendment provides that "no State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. While many scholars have debated whether this Clause espouses the principle of a "color-blind Constitution," the United States Supreme Court has recognized that the moral imperative of racial neutrality is the "driving force of the Equal Protection Clause." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 518, 109 S.Ct. 706, 734, 102 L.Ed.2d 854 (1989) (Kennedy, J. concurring in part).[3]

Perhaps the most utopian statement on racial neutrality came in the dissent to the majority opinion in the controversial case of *Plessy v. Ferguson.* "Our Constitution is color-blind, and neither knows nor tolerates classes among citizens." *Plessy v. Ferguson,* 163 U.S. 537, 559, 16 S.Ct. 1138, 1146, 41 L.Ed. 256 (1896) (Harlan, J., dissenting). In a perfect world, neither reverse discrimination nor affirmative action would constitute legal issues. Indeed, these social engineering programs serve primarily to aggravate racial tensions, not to heal past wounds.[4] However, taking our long and sad history of racial discord into account, the United States Supreme Court permits conscious discrimination against white males to compensate for past injustices inflicted upon minority groups. *Croson,* 488 U.S. at 524, 109 S.Ct. at 737 (Scalia, J. concurring in judgment). It is against this judicial mandate of race-con-

---

**3.** *See* Andrew Kull, *The Color–Blind Constitution* (1992) (Detailing the historical evidence and judicial philosophy underlying the concept of a color-blind Constitution.).

**4.** *See e.g., Fullilove v. Klutznick,* 448 U.S. 448, 547, 100 S.Ct. 2758, 2810, 65 L.Ed.2d 902 (1980) (Stevens, J. dissenting) ("[T]he creation of new barriers can only frustrate true progress. For as Mr. Justice Powell and Mr. Justice Douglas have perceptively observed, such protective barriers reinforce habitual ways of thinking in terms of classes instead of individuals. Preferences based on characteristics acquired at birth foster intolerance and antagonism against the entire membership of the favored classes."). *See also Croson,* 488 U.S. at 527–28, 109 S.Ct. at 739 (Scalia, J. concurring in judgment) ("[T]hose who believe that racial preferences can help to even the score display, and reinforce, a manner of thinking by race that was the source of the injustice and that will, if it endures within our society, be the source of more injustice still.").

**1462**

sciousness that the Court must approach this case.

█ In *Croson*, the Supreme Court announced the "strict scrutiny" test that the Court must apply to determine whether the Fire Department's affirmative action plan violates the Equal Protection Clause. *Id.* at 493, 109 S.Ct. at 721. To meet this two-pronged test, an affirmative action plan must: (1) be justified by a compelling government interest; and (2) be narrowly tailored to serve that interest. *Id.* The purpose of the strict scrutiny test is to "smoke out" illegitimate uses of race by assuring that a public employer is pursuing a goal important enough to warrant use of a highly suspect tool. *Id.* Indeed, unless classifications based on race are strictly reserved for remedial settings, they may in fact promote notions of racial inferiority. *University of California Regents v. Bakke*, 438 U.S. 265, 298, 98 S.Ct. 2733, 2752, 57 L.Ed.2d 750 (1978).

### I. Compelling Government Interest

█ To survive the first prong of the strict scrutiny test, the Fire Department must demonstrate that it engaged in prior discrimination against the favored groups. *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 274, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986). *See also Croson*, 488 U.S. at 504, 109 S.Ct. at 726–27 (Public employers "must identify that discrimination, public or private, with specificity before they may use race-conscious relief."). This showing of prior discrimination must be based upon "particularized" findings of earlier discrimination in the affected industry. *H.K. Porter Co. v. Metropolitan Dade County*, 975 F.2d 762, 766 (11th Cir. 1992). *See also Cone Corp. v. Hillsborough County*, 908 F.2d 908, 913–14 (11th Cir.1990) ("[A]t a base minimum, any plan must have more than an amorphous claim that there has been discrimination in a particular industry. Where plans establish quotas, the quotas must be tied to some injury suffered by the minority to be benefitted."). Generalized allegations of discrimination in the subject industry, or in education and training, have little probative value in identifying discrimination in the relevant industry. *Croson*, 488 U.S. at 503, 109 S.Ct. at 726.

The Fire Department relies on three grounds to demonstrate prior discrimination: (1) the statistical disparity between minority representation in the Fire Department and the number of qualified minorities in the available labor force; (2) anecdotal evidence of prior discrimination against minorities in the application process, including the outcome of past litigation and the obligations of a previous settlement order; and (3) the adverse effect of the firefighter examination on minorities.

### 1. Statistical Disparities

In *Croson*, the Supreme Court did not set out clear guidelines for selecting and evaluating statistical data in Equal Protection cases. *Croson*, 488 U.S. at 500, 109 S.Ct. at 724. *See also* Ronald D. Rotunda and John E. Nowak, *Treatise on Constitutional Law* § 18.10, at 171 (2nd Ed.1992) ("What type of proof is required to identify past discrimination? ... In a portion of Justice O'Connor's opinion which was a majority opinion, she appears to set out conflicting approaches to the use of statistics for identifying past discrimination."). The *Croson* Court held that evidence of a statistical imbalance that is sufficient for a Title VII prima facie case would satisfy the constitutional requirement that a public employer demonstrate "a strong basis in evidence for its conclusion that remedial action was necessary." *Croson*, 488 U.S. at 500, 109 S.Ct. at 724, *citing Wygant*, 476 U.S. at 277, 106 S.Ct. at 1848. The Court also stated: "When special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value." *Croson*, 488 U.S. at 501, 109 S.Ct. at 725, *quoting Hazelwood School Dist. v. United States*, 433 U.S. 299, 308 n. 13, 97 S.Ct. 2736, 2741 n. 13, 53 L.Ed.2d 768 (1977).

█ To state a prima facie case of a Title VII violation, a party may rely on a gross statistical disparity. *Hazelwood School Dist.*, 433 U.S. at 307–08, 97 S.Ct. at 2741. The existence of a gross statistical disparity has already been decided in this case. The Eleventh Circuit, after analyzing Peightal's Title VII claim, found that there was a gross

disparity between the number of minorities employed by the Fire Department and the number of minorities in the general population. *Peightal,* 940 F.2d at 1410. Chief Judge Tjoflat, however, noting the contradictory signals articulated by the Supreme Court in *Croson,* suggested that *Croson* might require a more detailed statistical analysis for Peightal's equal protection claim. *Id.* at 1411–12. This rigorous analysis requires that the Court determine: (i) whether the job of firefighter is an entry-level position or a skilled job; and (ii) whether the Fire Department's statistics properly compared the number of minority firefighters to the number of minorities in the available labor pool.

### (i). *Entry-level Position*

█ The relevant statistical pool to consider in this affirmative action equal protection claim is the qualified pool in the community who possess the special skills, if any, needed to be hired as a firefighter. *Krupa v. New Castle County,* 732 F.Supp. 497, 511 (D.Del. 1990). Peightal argues that the position of firefighter is a skilled job, rather than an entry-level position, because it requires special qualifications. The seven prerequisites for becoming a firefighter, however, do not rise to the level of special skills or training. The job does not require pre-employment training or certification, nor a college education.

Moreover, at least two courts have found that the position of firefighter is "entry-level and non-skilled." *See Davis v. City and County of San Francisco,* 890 F.2d 1438, 1447 (9th Cir.1989) (Noting that the firefighter position was an entry-level job, the Court approved a comparison between minorities hired by the fire department and minorities in the general population.); *Bennett v. Arrington,* 806 F.Supp. 926, 931 (N.D.Ala.1992) (Concluding that a consent decree was properly tailored to an appropriate relevant labor market because "the position of firefighter is an unskilled position."). The Court concludes, therefore, that the position of firefighter in Dade County is an entry-level position.

### (ii). *Proper Statistical Comparison*

The Court also concludes that the Fire Department's statistical proffer at trial—a comparison between the number of minorities in the Fire Department and the number of minorities between the ages of 18 and 55 in the general population of Dade County—satisfies the statistical concerns set out by the Supreme Court in *Croson* and by Chief Judge Tjoflat in *Peightal.* In *Peightal,* Chief Judge Tjoflat stated:

> The district court should have compared the appellee's work force to that segment of the general population of Dade County who qualify for work as entry-level firefighters. While I appreciate the difficulty, if not impossibility, in obtaining labor market figures that precisely identify the racial composition of the qualified applicant pool, the district court, at the very least, could have compared the appellee's work force to those members of the general population of Dade County who fall within the qualified age group (for which figures are readily available).

*Peightal,* 940 F.2d at 1413.

At trial, the Fire Department presented a refined statistical analysis incorporating Chief Judge Tjoflat's suggestions. This analysis demonstrates a gross statistical disparity between the number of minorities in the Fire Department and the number of minorities between the ages of 18 and 55 in the general population of Dade County. In particular, the Fire Department presented statistics indicating that in 1983, the difference between the expected and actual percentage of blacks in the Fire Department, given the percentage in the age-eligible population, was *4.8* standard deviations. Similarly, the difference between the expected and actual percentage of Hispanics in the Fire Department, given the percentage in the age-eligible population, was *17.6* standard deviations.[5] "A difference of greater than two or three standard deviations between the expected per-

---

**5.** The Second Circuit recently explained the significance of a statistical analysis using standard deviation theory:

> Standard deviation analysis measures the probability that a result is a random deviation from a predicted result—the more standard deviations the lower the probability the result

centage and the observed percentage of minorities in a relevant labor pool can be sufficient to support an inference of discrimination." *Hazelwood,* 433 U.S. at 308 n. 14, 97 S.Ct. at 2742 n. 14.[6]

Peightal argued that the relevant statistics should also take into account the percentage of minorities in Dade County who possess a high school diploma, have 20/40 vision, and can obtain a drivers license—three additional hiring criteria besides the age requirement. Peightal's suggestion that the Court consider drivers license data is chimeric. There is no realistic way to determine how many minorities *might* be able to obtain a drivers license. As to the vision requirement, Peightal did not proffer a source that breaks down the percentage of whites and minorities who suffer from less than perfect vision. As Chief Judge Tjoflat recognized, district courts encounter a difficult, if not impossible task in obtaining such tailored statistics. *Peightal,* 940 F.2d at 1413. The Court agrees in principle with Peightal, however, that the percentage of minorities who possess a high school diploma or a General Equivalency Diploma ("GED") is a relevant factor for defining the available labor pool.[7] Absent supporting data, however, the Court is unable to assess the impact of this factor on the Fire Department's plan.

■ The Fire Department presented testimony at trial indicating that it did not know of the existence of any pre–1980 statistics setting forth the level of education of minorities in Dade County. Indeed, testimony proffered by the Fire Department through Dr. Santisteban indicates that these statistics are available in the 1990 United States Census, but were not available through the census in the 1970s and 1980s.[8] Peightal, however, failed to address this type of data or to present any evidence that this data was available in 1983. The final burden rests on Peightal to demonstrate, not only that these statistics are available, but that they would indicate that there is not a gross statistical disparity. *Howard v. McLucas,* 871 F.2d 1000, 1007 (11th Cir.1989). *See also Wygant,* 476 U.S. at 277–78, 106 S.Ct. at 1848–49 (O'Connor, J. concurring) ("The ultimate burden remains with the employees to demonstrate the unconstitutionality of an affirmative action program."). Peightal, therefore, failed to contradict the Fire Department's evidence supporting the existence of a gross statistical disparity between minorities in the Fire Department and minorities in the qualified applicant pool. Peightal's mere speculation as to the impact of educational statistics is unconvincing.

Peightal also attacked the Fire Department's statistical proffer on the grounds that it fails to consider the effects of the dramatic influx of immigrants into Dade County in the

---

is a random one. Social scientists consider a finding of two standard deviations significant, meaning there is about one chance in 20 that the explanation for the deviation could be random and the deviation must be accounted for by some factor other than chance. A finding of two or three standard deviations (one in 384 chance the result is random) is generally considered highly probative of discriminatory treatment.
*Waisome v. Port Authority,* 948 F.2d 1370, 1376 (2nd Cir.1991) (citations omitted).

6. Although *Hazelwood* was a Title VII case rather than an equal protection case, the statistical methodology used in Title VII cases is also probative in equal protection analyses. *Billish v. City of Chicago,* 962 F.2d 1269, 1284 n. 10 (7th Cir.1992).
The United States Supreme Court has cautioned against the indiscriminate use of standard deviation evidence, noting that "we have not suggested that any particular number of standard deviations can determine whether a plaintiff has made out a prima facie case in the complex area of employment discrimination." *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 996 n. 3, 108 S.Ct. 2777, 2790 n. 3, 101 L.Ed.2d 827 (1988).

7. In *Bertoncini v. City of Providence,* 767 F.Supp. 1194, 1203 (D.R.I.1991), the court rejected statistical comparisons between the percentage of minorities in the fire department and in the general population because of "the possibility that some minority groups include large numbers of recent immigrants who have not yet obtained high school equivalency certificates." *Id.* at 1203.

8. The Court has verified that this data is currently available. For example, the Court takes notice of the fact that in the United States in 1991, 35.3% of all Hispanics between the ages of 16 and 24 were high school dropouts, roughly the same percentage as in 1972. William Celis, *Hispanic Dropout Rate Stays High, Since Children Work in Hard Times,* N.Y. Times, October 14, 1992 at B9. By comparison, the rate for blacks during the period fell from 21.3% to 13.6%, and the rate for whites fell from 12.3% to 8.9%. *Id.*

late 1970s and early 1980s.[9] Clearly, the existence of dramatic increases in the size of minority groups would bear on whether their underrepresentation in the Fire Department was caused by sudden demographic changes or by past discrimination by the Fire Department. *Bertoncini v. City of Providence,* 767 F.Supp. 1194, 1203 (D.R.I.1991). Dade County's population statistics, however, reveal a gross statistical disparity between the number of minorities in the qualified labor pool and the number of minorities in the Fire Department that predates these large migrations from Cuba, Haiti and Nicaragua.[10]

■ Having analyzed the statistical data, the Court finds that Peightal failed to: (1) show that the Fire Department's statistics are flawed; (2) demonstrate that the disparities shown by the statistics are not significant or actionable; or (3) present contrasting statistical data. *See Coral Construction Co. v. King County,* 941 F.2d 910, 921 (9th Cir. 1991); *Chicago Fire Fighters Union Local No. 2 v. Washington,* 736 F.Supp. 923, 930 (N.D.Ill.1990). Consequently, the Court concludes that a gross statistical disparity existed between the number of minorities in the available labor pool and the number of minorities employed by the Fire Department as firefighters when the affirmative action plan was implemented.

### 2. The 1982 Settlement Order and Anecdotal Evidence

■ Anecdotal evidence of past discrimination, standing alone, is rarely enough to prove the systemic pattern of discriminatory practices necessary for the adoption of an affirmative action program. *Coral Construction Co. v. King County,* 941 F.2d 910, 919 (9th Cir.1991). "Nonetheless, the combination of convincing anecdotal evidence and statistical evidence is potent." *Id.*

■ In 1982, the Fire Department was the subject of a series of allegations of racial discrimination by minority firefighters. A number of these complaints ultimately resulted in a settlement agreement between the Fire Department and a group of black firefighters, the Progressive Firefighters Association. This settlement agreement, signed in 1982, required the Fire Department to validate the Fire Department's selection procedures and to establish a special recruitment team to actively recruit minority applicants. In addition to these lawsuits, there were a number of discrimination charges levelled at the Fire Department in the early 1980s concerning entry-level application procedures.

The Court finds that the anecdotal evidence presented by the Fire Department through its affirmative action officer and corroborated by the settlement order reinforces the statistical evidence as proof of past discrimination.[11]

### 3. Adverse Impact of the Firefighter Examination

■ The Fire Department also contends that the adverse impact of the firefighter

9. Peightal addressed the mass migration to Dade County at trial and in his Proposed Findings of Fact and Conclusions of Law, but failed to delve into the particularities of the migration. In the beginning of the 1980s, "[T]here was Mariel with its 125,000 Cuban refugees, often poorer than Cubans who had come earlier. Around the same time, thousands of Haitians ventured across the Windward Passage to South Florida. Then came Nicaraguans, more than 100,000 of whom fled Sandinista rule and civil war during the 1980s." Dexter Filkins & Carl Goldfarb, *Dade Incomes Stagnant in '80s,* Miami Herald, April 3, 1992 at A23 (Providing a complete overview of the recent history of Hispanic immigration to Dade County).

10. By 1975, when the Hispanic population comprised 34% of Dade County's general population between the ages of 18 and 55, Hispanics only accounted for 3% of the total number of firefighters. At the same time, blacks comprised 16% of the population, but accounted for only 8% of the total number of firefighters.

11. The Court notes that the Fire Department could have further buttressed its case by presenting individual witnesses who could testify about their personal experiences with discrimination at the time that they applied for firefighting jobs. *See* Daron S. Fitch, *The Aftermath of Croson,* 53 Ohio St.L.J. 555, 582 (1992) (Describing how local governments may use public hearings, written affidavits, past law suits, complaints and newspaper articles to demonstrate past discrimination.). This type of testimony can bring "the cold numbers convincingly to life," and strengthen evidence of statistical disparities. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 339, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977).

selection procedures on minorities contributed to past discrimination. In April, 1984, a study analyzing the validity of the Fire Department's employment selection procedures was released by the Human Services Institute. The first conclusion of the study was that the written examination and, to a lesser extent, the physical capabilities test, did not accurately predict future job performance. The second conclusion was that the two tests, especially the written test, had an adverse impact upon minority applicants. The results of this study further convince the Court that the Fire Department had a compelling interest in instituting an affirmative action program to remedy past discrimination against minorities and women by the Fire Department. *See Billish v. City of Chicago,* 962 F.2d 1269, 1289 (7th Cir.1992). .

Peightal argued that the Fire Department cannot rely on the study showing the adverse impact of the written examination and physical capabilities test because the Fire Department did not consider the study when it decided to initiate the affirmative action plan.[12] It is true that a municipality must have *some* concrete evidence of discrimination before it may adopt a remedial program. *Coral Construction Co. v. King County,* 941 F.2d 910, 920 (9th Cir.1991). "Without *any* evidence of discrimination, it cannot be fairly said that the state is seeking to remedy a problem.... Thus, any program adopted without some legitimate evidence of discrimination is presumptively invalid." *Id.* at 920. This requirement of *some* evidence, however, does not mean that an affirmative action program must be struck down if the evidence before the municipality at the time of enactment does not completely fulfill both prongs of the strict scrutiny test. *Id.*

The Fire Department depended upon evidence of a statistical disparity, a settlement order and anecdotal evidence in deciding to institute an affirmative action program. The additional evidence presented at the second trial, namely the adverse impact of the selection procedures and the refined statistical analysis, serves the purpose of retrospective analysis and corroboration of past discrimination.

## II. Narrowly Tailored

■ The second prong of the strict scrutiny test requires the Court to determine whether the affirmative action program is narrowly tailored to achieve a compelling state interest. *Croson,* 488 U.S. at 493, 109 S.Ct. at 721; *Wygant,* 476 U.S. at 274, 106 S.Ct. at 1847. In determining whether an affirmative action plan is narrowly tailored, the Court must consider several factors, including: (1) "the necessity for the relief and the efficacy of alternative remedies;" (2) "the flexibility and duration of the relief, including the availability of waiver provisions;" (3) "the relationship of the numerical goals to the relevant labor market;" and (4) "the impact of the relief on the rights of third parties." *United States v. Paradise,* 480 U.S. 149, 171, 107 S.Ct. 1053, 1066, 94 L.Ed.2d 203 (1987) (plurality opinion); *Howard v. McLucas,* 871 F.2d 1000, 1008 (11th Cir.), *cert. denied* 493 U.S. 1002, 110 S.Ct. 560, 107 L.Ed.2d 555 (1989).

### 1. The Efficacy of Alternative Remedies

Consideration of race-neutral alternative remedies is probably among the most important of the various narrow tailoring requirements. *Coral Construction Co.,* 941 F.2d at 922. "Nevertheless, while strict scrutiny requires serious, good faith consideration of race-neutral alternatives, strict scrutiny does not require the exhaustion of every possible alternative." *Id.* at 923.

■ The long-term goal of the Fire Department's affirmative action plan was to partially relieve the underrepresentation of minorities and women in the Fire Department. The Fire Department initially attempted to use alternative methods to achieve its goals, but these methods were unsuccessful. Specifically, the Fire Department implemented various high school and college recruiting programs designed to convince young minorities to apply for firefighting positions. In addition, the Fire Depart-

---

**12.** The affirmative action plan was implemented in 1983, but the "Job Analysis and Selection Procedure Study" was not issued until 1984.

ment held outreach programs conducted by minority firefighters, and designated a recruitment specialist to make presentations at job fairs and career days at local colleges.

These programs achieved limited success, but they failed to solve the problem of underrepresentation of minorities. The Fire Department's rank-ordered applicant list was overwhelmingly dominated by white males, even after the implementation of race neutral alternative remedies. In fact, hiring in strict accordance with the rank-ordered list of applicants in 1983 would have resulted in the hiring of no female or black applicants and only a handful of Hispanic applicants. Therefore, the Fire Department found it necessary to take more drastic measures to address the problems caused by its past discrimination.[13]

### 2. The Flexibility and Duration of the Relief

The second prong of the narrowly tailored requirement is program flexibility. *Croson*, 488 U.S. at 507–508, 109 S.Ct. at 728. Program flexibility may be achieved through the use of case-by-case goals, rather than rigid numerical quotas. *Id.* "A goal is by definition more flexible than an unyielding quota." *Billish*, 962 F.2d at 1290. The affirmative action program in *Croson* was fatally flawed because of its use of a mandatory 30% quota for each city contract. *Id.* at 507, 109 S.Ct. at 728. Such a quota "rests upon the completely unrealistic assumption that minorities will choose a particular trade in lockstep proportion to their representation in the local community." *Id.*

■ The Fire Department's affirmative action program substantially avoids the quota pitfalls. The program utilizes a 70% rule, not a 100% rule. In other words, the Fire

Department only tries to achieve substantial minority representation, not "lockstep" representation. More importantly, the numerical targets set out each year by the Fire Department's affirmative action office are goals, not quotas, because the targets are not mandatory requirements.

Peightal argued that "the successful goal uses race or national origin as a factor or consideration and not as a badge of preference.... When the Defendant implemented its six categories of racial and ethnic groupings, insulating them from competition, it effectively set aside jobs in a de facto quota form." (Plaintiff's Pretrial Memorandum, D.E. # 73). In 1983, however, the Fire Department failed to reach its affirmative action goals, despite the presence of numerous minority applicants who did not receive employment offers.[14] This occurred because the Fire Department only considered qualified applicants for inclusion in the affirmative action program. *See United States v. Paradise*, 480 U.S. 149, 177–78, 107 S.Ct. 1053, 1069–70, 94 L.Ed.2d 203 (1987) (Finding remedy flexible because it required qualified applicants and did not require gratuitous promotions.). *See also Johnson v. Transportation Agency, Santa Clara County*, 480 U.S. 616, 638, 107 S.Ct. 1442, 1455, 94 L.Ed.2d 615 (1987) (Approving affirmative action plan because it "merely authorize[d] that consideration be given to affirmative action concerns when evaluating qualified applicants."). Minority applicants who scored below the passing grade on the entrance examination (70%) were not placed on the eligible list as qualified candidates.[15]

If the Fire Department had conducted a quota-based affirmative action program, it would have reached its numerical targets, unless there were simply not enough appli-

---

**13.** In this regard, the situation in this case differs dramatically from *Croson*, where the Supreme Court noted that there was no evidence in the record that the Richmond City Council considered any alternatives to the racial quota adopted. *Croson*, 488 U.S. at 507, 109 S.Ct. at 728.

**14.** The Fire Department anticipated hiring 29 Hispanic males, eight black females and eight Hispanic females. The actual class of incoming recruits contained 24 Hispanic males, five black females and four Hispanic females.

**15.** Dade County's "Affirmative Action Policy and Statement: Goals and Timetables" explains the hiring policy:

Under a system of goals ... the County is never required to hire a person who does not have the qualifications needed to perform the job successfully; and the Department is never required to hire an unqualified person in preference of another applicant who is qualified.

**1468**

cants. In a quota-based affirmative action program, the numerical targets *must* be achieved. For instance, in *Bertoncini,* the Court found that the fire department's affirmative action program was a quota plan, because it employed a strict 20% minority hiring requirement, and because it allowed the city to reach unqualified applicants to satisfy the quota requirement. *Bertoncini,* 767 F.Supp. at 1203. In this case, however, the Fire Department has demonstrated that its affirmative action program was not a quota system, because the hiring goal was not mandatory, and the Fire Department did not hire unqualified applicants.[16]

Finally, the Fire Department's affirmative action plan meets the *Croson* standard because it contains a provision ensuring that the program will come to an end when it achieves it's 70% hiring goal. Without this protection, the affirmative action program would not survive strict scrutiny. *Davis v. City of San Francisco,* 890 F.2d 1438, 1447 (9th Cir.1989). *See also Billish,* 962 F.2d at 1290 (Noting that the affirmative action program was of limited duration because it was designed to last three years or until the implementation of a specified number of promotions.).

3. The Relationship of the Numerical Goals to the Relevant Labor Market: Underinclusiveness and Overinclusiveness

Peightal challenges the Fire Department's affirmative action program on the grounds that it is overinclusive and underinclusive in its preferential treatment of Hispanics. Peightal argues that the Fire Department's affirmative action plan is overinclusive be-

cause the term "Hispanic" is overly broad, encompassing "subgroups" that did not suffer past discrimination in Dade County. In addition, Peightal argues that the plan is underinclusive because the term "Hispanic" fails to include other ethnic groups that *have* suffered past discrimination in Dade County.

In *Croson,* the Supreme Court emphasized that the narrow tailoring prong of the strict scrutiny test requires any affirmative action plan to be limited to *groups* that have suffered past discrimination. *Croson,* 488 U.S. at 506, 109 S.Ct. at 728. The Court found the Richmond plan overinclusive because it offered hiring preferences to groups, such as Aleuts and Eskimos, that may have never even been present in Richmond. *Id.* "The random inclusion of racial groups that, as a practical matter, may never have suffered from discrimination in the construction industry in Richmond, suggests that perhaps the city's purpose was not in fact to remedy past discrimination." *Id.*[17]

(i). *Overinclusiveness*

The EEOC definition of "Hispanic," as applied by the Fire Department in its affirmative action plan, includes: "All persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish culture or origin, regardless of race." (Plaintiff's Trial Exhibit, #14, First Trial). The EEOC guidelines also contain a requirement that a person's claim of identification with a certain racial or ethnic group "should accompany strong visible indication that the person *culturally* and *linguistically* identifies with the group he or she claims." *Id.*

---

16. The use of dual lists to separate the scores of minority applicants from majority applicants does not automatically violate the Equal Protection Clause. *Jansen v. City of Cincinnati,* 977 F.2d 238, 243–44 (6th Cir.1992).

17. The Court also questioned the Richmond City Council's motives for establishing an affirmative action program because five of the nine seats on the City Council were controlled by blacks, and blacks constituted 50% of Richmond's population. *Croson,* 488 U.S. at 495, 109 S.Ct. at 722. "The concern that a political majority will more easily act to the disadvantage of a minority based on unwarranted assumptions or incomplete facts would seem to militate for, not against, the application of heightened scrutiny." *Id.* at 495–96, 109 S.Ct. at 722 *citing* John Ely, *The Constitu-*

*tionality of Reverse Racial Discrimination,* 41 U.Chi.L.Rev. 723, 739 n. 58 (1974) ("Of course it works both ways: a law that favors Blacks over Whites would be suspect if it were enacted by a predominantly Black legislature.").

These concerns, however, do not apply to this case. In 1983, the white population of Dade County was 47% and the Hispanic population was only 36%. Indeed, it was not until 1990 that Hispanics in Dade County, like blacks in Richmond, became the majority group. *Meek v. Metropolitan Dade County,* 805 F.Supp. 967, 988 (S.D.Fla.1992). In addition, there was only one Hispanic representative on the eight-member Dade County Commission in 1983. *Id.* at 992–93.

The Fire Department's affirmative action program follows these guidelines.[18] When prospective applicants submit their employment applications to the Fire Department, they are asked to "self-identify" their ethnic and racial background on a separate form. The Fire Department accepts the self-identification as valid unless the applicant is challenged by another applicant or employee. If challenged, the applicant (or employee) is interviewed by the affirmative action office, where the EEOC guidelines are applied to the person's self-identification.

Peightal's primary argument is that the Fire Department's use of the term "Hispanic" and its application of the EEOC guidelines to this term are overinclusive, because numerous "sub-groups" of the term "Hispanic" that were not present in Dade County in the 1960s or 1970s are allowed to benefit from the affirmative action plan. In 1983, the Fire Department adopted the affirmative action program with specific findings of evidence of past discrimination against the "primary group" of Hispanics, but it did not provide direct evidence of past discrimination against any distinct Hispanic "sub-groups." Therefore, Peightal contends the Fire Department violated *Croson's* requirement that all affirmative action programs be strictly limited to groups that have suffered past discrimination.

The Supreme Court has specifically held that affirmative action plans need not benefit only identifiable victims of discrimination.[19] In *Croson*, the Court focused on the fact that the Richmond plan could potentially benefit minority businesses in other states, including businesses that had never attempted to conduct business in Richmond. "Thus, it is not surprising that the majority of circuits that have addressed this issue ... have read *Croson* to require that ... there must be a showing of prior discrimination against the racial or ethnic *group* that benefits under the program." *Billish*, 962 F.2d at 1293.

Peightal's attempt to expand this requirement to "sub-groups" is unsound. In *Croson*, the Supreme Court did not require government bodies to conduct a detailed examination of an affirmative action program's beneficiaries by breaking down each racial and ethnic group into "sub-groups." Clearly, the Supreme Court's demand in *Croson* for an inquiry into whether or not the particular [minority business] seeking a racial preference has suffered from the effects of past discrimination in a locality cannot be read without reference to the particular factual setting of each case. *Billish*, 962 F.2d at 1292, *citing Croson*, 488 U.S. at 508, 109 S.Ct. at 728–29.

In 1983, Dade County recognized that past discrimination against several racial and ethnic groups was causing underrepresentation of these groups in the Fire Department, so it instituted an affirmative action program to address these problems. If the Court accepts the proposition that the term "Hispanic" is overbroad, then the Fire Department would have to set up an affirmative action program that only benefits those "sub-groups" that were present in Dade County in the 1970s and 1980s.[20] For instance, an applicant might qualify for affirmative action if the applicant was African–American, but not

---

**18.** The Court notes that a number of affirmative action programs have tried to develop a narrower substitute for the term "Hispanic." *See Shurberg Broadcasting of Hartford, Inc. v. F.C.C.*, 876 F.2d 902 (D.C.Cir.1989) ("Hispanic surnamed"); *Mackin*, 969 F.2d at 1274 n. 2 ("Spanish-surnamed"); *Fullilove v. Klutznick*, 448 U.S. at 464, 100 S.Ct. at 2767 ("Spanish–Americans"); and *Croson*, 488 U.S. at 478, 109 S.Ct. at 713 ("Spanish-speaking").

**19.** *See Local 28 of the Sheet Metal Workers Int'l Ass'n v. EEOC*, 478 U.S. 421, 480, 106 S.Ct. 3019, 3052, 92 L.Ed.2d 344 (1986) ("We have consistently recognized that government bodies constitutionally may adopt racial classifications as a remedy for past discrimination.") (plurality opinion) (citing *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), and *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971)).

**20.** The Fire Department would be indirectly forced to conduct a detailed examination into the ancestry and cultural background of each of the thousands of individual applicants. In addition, following Peightal's rationale, any ethnic, national, or racial classification could always be further broken down into another "sub-group."

Haitian, or Cuban, but not Nicaraguan. In fact, any racial term used in an affirmative action program would be susceptible to the same type of over-breadth challenge as the Fire Department's use of the term "Hispanic."[21]

The Supreme Court has not yet found it necessary to specifically address appropriate criteria for determining membership in a preferred minority group or class. *Shurberg Broadcasting of Hartford, Inc. v. F.C.C.*, 876 F.2d 902, 916 n. 19 (D.C.Cir.1989). *See also Metro Broadcasting, Inc. v. F.C.C.*, 497 U.S. 547, 633 n. 1, 110 S.Ct. 2997, 3045 n. 1, 111 L.Ed.2d 445 (Kennedy, J., dissenting) ("The Court fails to address the difficulties, both practical and constitutional, with the task of defining members of racial groups that its decision will require."). As the District of Columbia Circuit Court noted in *Shurberg:*

> It simply cannot be that administrative and judicial determinations of minority status can or would turn on genealogical inquiries. Besides the horrifying historical associations that would accompany such proceedings, *see, e.g.*, Justice Stevens' citation in his dissent of the Reichs Citizenship Law of November 14, 1935, defining Jews, *Fullilove*, 448 U.S. at 534 n. 5, [100 S.Ct. at 743 n. 5] there are no appropriate objective criteria that could be applied.

*Shurberg*, 876 F.2d at 917 n. 19.

The Court agrees that "the time cannot come too soon when no governmental decision will be based upon immutable characteristics of pigmentation or origin." *Fullilove*, 448 U.S. at 516, 100 S.Ct. at 733 (Powell, J. concurring). The very attempt to define with precision a beneficiary's qualifying racial characteristics is repugnant to our constitutional ideals. *Id.* at 534 n. 5, 100 S.Ct. at 743 n. 5.

In this case, it is inevitable that many beneficiaries of the Fire Department's affirmative action program will be persons who never suffered individual discrimination. In addition, many beneficiaries will be members of distinct black or Hispanic subgroups that did not suffer past discrimination at the hands of Dade County. This Court, however, finds that the Fire Department's affirmative action program, though far from perfect, is not flawed by the gross overinclusiveness found in the *Croson* plan. In this regard, therefore, the program comports with the Supreme Court's requirement of narrow tailoring.

### (ii). Underinclusiveness

Peightal also claims that the Fire Department's affirmative action program is underinclusive. At trial, Peightal illustrated various problems concerning the EEOC guidelines and the Fire Department's application of these guidelines. Peightal pointed out, for instance, that Spaniards can qualify for affirmative action as Hispanics, but other individuals of European origin, such as Greeks, Italians, Israelis, Iranians, and Jews, are not eligible for affirmative action, because they are classified as whites. Peightal contends that members of these European groups are equally subject to employment discrimination because of their ethnic characteristics. Peightal further notes that applicants born in Brazil of Spanish-speaking parents qualify for affirmative action, while Brazilian applicants of Portuguese-speaking parents do not qualify for affirmative action.[22]

---

21. For instance, Peightal could just as easily have challenged the use of the term "black." The EEOC definition of "black" includes: "All persons having origins in any of the Black racial groups of Africa." This definition includes Haitians. In the 1980s and early 1990s, a large number of Haitians migrated into Dade County. Obviously, these immigrants were never individual victims of past discrimination by Dade County, and there is no evidence that the black subgroup of "Haitians" was victimized by past discrimination. There was, however, evidence of past discrimination against the primary group of "blacks." The subgroup of Haitians, of course, is part of the primary group of "blacks."

22. The Court acknowledges that the EEOC guidelines are far from perfect. In fact, the guidelines may be inconsistent. For example, the EEOC guidelines provide that whites are "all persons having origins in any of the original peoples of Europe, North Africa or the Middle East." (Plaintiff's Trial Exhibit, # 14, First Trial). A person born in Spain, however, may be classified as white *or* Hispanic according to the EEOC guidelines. Such a person would meet the definition of "white" because the person's "origins [are] in an original people of Europe." That same person would meet the definition of "Hispanic" because the person is of "Spanish culture or origin." The constitutionality of the

Peightal, however, proffered no evidence in support of these underinclusiveness arguments. Moreover, any discussion of this issue is merely speculative. *Peightal,* 940 F.2d at 1409 n. 39 ("Peightal's standing to bring this issue is dubious, since there is nothing in the record showing that Peightal is a member of any of these unprotected groups."). Nevertheless, it is well established that the Equal Protection Clause does not require public employers to institute affirmative action goals for each and every ethnic group that may exist in a community. *Peightal,* 940 F.2d at 1409 (Brown, J. dissenting). In fact, if the Fire Department had included other groups in the affirmative action program without evidence of past discrimination, it would have violated *Croson. See Croson,* 488 U.S. at 506, 508, 109 S.Ct. at 728, 728–29.

### 4. The Effect of the Remedy Upon Innocent Third Parties

The impact of the Fire Department's affirmative action program on non-minorities is minimal. The affirmative action plan does not require any layoffs and does not pose an absolute bar to the hiring of non-minorities.[23] As the Supreme Court has noted:

> In cases involving valid *hiring* goals, the burden to be borne by innocent individuals is diffused to a considerable extent amongst society generally. Though hiring goals may burden some innocent individuals, they simply do not impose the same kind of injury that layoffs impose. Denial of a future employment opportunity is not as intrusive as loss of an existing job.

*Wygant,* 476 U.S. at 282–83, 106 S.Ct. at 281. Moreover, the failure to hire more high-scoring whites under the program disturbs no legitimate, firmly rooted expectations on the part of those applicants. *Mackin v. City of Boston,* 969 F.2d 1273, 1278 (1st Cir.1992). Applicants to government positions are not entitled to a government job. The affirmative action program may have resulted in disappointment for Alan Peightal, but the program simply did not rise to the level of a constitutional violation.

### CONCLUSION

 The Court concludes that the Fire Department's affirmative action program satisfies the strict scrutiny test set forth in *Croson.* Specifically, the Fire Department demonstrated that the program is justified by the compelling purpose of redressing past discrimination, and it is narrowly tailored to achieve that goal.

Accordingly, it is hereby

ORDERED AND ADJUDGED that judgment shall be entered in favor of the Defendant, Metropolitan Dade County, and against the Plaintiff, Alan Andrew Peightal, by separate order, pursuant to *Fed.R.Civ.P.* 58.

DONE AND ORDERED.

EEOC guidelines, however, is not an issue before the Court.

**23.** In fact, there were apparently as many as 23 white males hired out of a total of 86 in the 1983 recruiting class.